## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

|  |  |
|---|---|
| WILDWOOD CONSULTING, LLC | ) |
| | ) |
| Plaintiff, | ) CIVIL ACTION FILE NO.: |
| | ) |
| v. | ) 4:21-CV-00138-LMM |
| | ) |
| ROGERS FINISHING, LLC d/b/a | ) |
| ADD BAC, ADD BAC, INC., | ) PLAINTIFF'S RESPONSE BRIEF IN |
| ED STATEN, and JUDY STATEN, | ) OPPOSITION TO DEFENDANTS' |
| | ) MOTION TO DISMISS |
| Defendants. | ) |
| | ) |

## PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

COMES NOW, Plaintiff WILDWOOD CONSULTING, LLC ("Wildwood"), and hereby responds to Defendants', ROGERS FINISHING, LLC d/b/a Add Bac ("Add Bac"), ADD BAC, INC. ("ABI"), WARREN "ED" STATEN ("Ed Staten"), and JUDY STATEN (collectively, "Defendants"), Memorandum of Law in support of its Motion to Dismiss (Doc. 11-1). In support of Plaintiff's complaint, showing factual assertions exist to overcome Defendants' Motion to Dismiss, Plaintiff now shows the following:

**INTRODUCTION**

Plaintiff Wildwood has asserted claims for breach of contract against Add Bac and ABI, and separately against the Mr. and Mrs. Staten (Counts I and II, respectively). Plaintiff has also asserted claims against all Defendants for misappropriation of trade secrets under the federal Defend Trade Secrets Act (Count III), misappropriation of trade secrets under the Georgia Trade Secrets Act (Count IV), equitable accounting (Count V), a count to pierce the corporate veil (Count VI), punitive damages (Count VII), and attorneys' fees (Count VIII).

These claims stem from Defendants' conduct concerning a Manufacturing Licensing Agreement ("MLA") (Doc. 1 at 39) and a Confidentiality/Nondisclosure Agreement ("NDA") between the parties (Doc. 1 at 47). Pursuant to the MLA, Wildwood granted a license to Defendants to use Wildwood's unique and proprietary polyurethane coating technology ("CT") in exchange for certain royalty payments. (Doc. 1 at 40). The CT formula is used for adhesion of synthetic turf. (Doc. 1 at 4 ⁋13). Section III of the MLA addressed how this "Royalty" should be reported, calculated, and paid to Wildwood throughout the license's five-year term. (Doc. 1 at 40).

Quality control measures were included in the MLA (Doc. 1 at 42) prohibiting Defendants from altering Wildwood's CT formula without express permission, as

well as a "Confidentiality" section that covered and protected any information classified as confidential at the time of a disclosure and any "information which by its nature is normally considered confidential." (Doc. 1 at 44). The NDA provided further protections for "any facts, opinions, conclusions, *projections, data, information, trade secrets,* or know-how relating to any research project, work in process, future development, *engineering, manufacturing*, marketing…its present or future products, technology, formulas, recipes, [or] processes…" (Doc. at 47) (emphasis added).

The NDA required that confidential information only be shared on a "need to know basis which is directly and solely for the authorized purposes under this Agreement." (Doc. 1 at 48). Anyone receiving confidential information was required to agree to the NDA terms prior to disclosure and to be given permission by Wildwood to receive that information. *Id.* Defendants were also obligated to keep a log of each employee granted access to confidential information. *Id.*

Mr. Timothy Croley is the President and owner of Wildwood. (Doc. 1 at 2). Upon a visit to the Add Bac facility, he observed that Mr. Tim Brown, a recognized member of the industry with knowledge and skill in the art of chemical compounds, was present during the production of the CT. (Doc. 1, ¶ 35). It was then that Mr. Croley discovered Add Bac/ABI had disclosed the proprietary information directly

related to the CT formula without authorization. (Doc. 1, ℙ 36). Mr. Croley further discovered that Add Bac/ABI admitted it had altered the formula knowing that such alteration was prohibited by the MLA. (Doc. 1, ℙℙ 37-38).

After the license term expired, Add Bac and the other Defendants used and continue to use the altered CT formula in breach of the MLA. (Doc. 1, ℙℙ 39, 42). Defendants failed to produce the contractually-mandated written report that calculates the Royalty payments due to Plaintiff (Doc. 1, ℙ 44) and are in arrears of over $400,000.00 in unpaid Royalties under the terms of the MLA. (Doc. 1, ℙℙ 42-45). As a result, Wildwood sent a demand letter on April 24, 2019 requesting Defendants cease using the CT formula and remit payments to Wildwood. (Doc. 1, ℙℙ 46-47). A mediation was conducted on or about August 20, 2019, but the parties were not able to reach a resolution at mediation. To date, Defendants still refuse to remedy the situation, forcing Plaintiff to file this lawsuit. (Doc. 1).

## MOTION TO DISMISS STANDARDS

### *Federal Rule of Civil Procedure 12(b)(6)*

A plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009). A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable." *Id.* at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).

<u>*Incorporation by Reference Doctrine*</u>

Although "all well-pleaded facts are accepted as true," Defendants' motion to dismiss argues several factual disputes outside of Plaintiff's complaint, and thus outside the bounds of their 12(b)(6) motion to dismiss. This Circuit "has adopted the 'incorporation by reference doctrine,' which permits a court to consider a document attached to a pleading without requiring the court to convert the motion to dismiss into one for summary judgment." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

Rule 12(b)(6) "is not designed to strike inartistic pleadings…, and the analysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto." *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1368 (11th Cir. 1997).

> However, where the plaintiff refers to certain documents in the complaint and those documents are central to the

> plaintiff's claim, then the Court may consider the
> documents part of the pleadings for purposes of Rule
> 12(b)(6) dismissal, and the defendant's attaching such
> documents to the motion to dismiss will not require
> conversion of the motion into a motion for summary
> judgment. Nonetheless, for the purposes of the motion to
> dismiss, the complaint must be construed in a light most
> favorable to the plaintiff and the factual allegations taken
> as true.

*Id.* at 1369. A district court "may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010).

Defendants conjured a list of claims which they then characterize as, "facts [that] are assumed to be true." (Doc. 11-1 at 4). In this enumeration of supposed "facts," Defendants inserted their own allegations including the notion that Plaintiff "provided no response other than the April 24, 2019 letter" to address its belief that Defendants misappropriated the CT. (Doc. 11-1 at 11). Defendants further fabricated a "fact" that there was a delay of "nearly two-and-a-half years (817 days, to be exact) of complete inaction from Plaintiff" to suggest an unsupported theory of waiver of trade secret protection. (Doc. 11-1 at 5). Leaving aside that Defendants' conjured allegations are untrue, their primary objection is a factual determination as to the veracity of the NDA to determine whether it constitutes reasonable protective measures of a trade secret. (Doc. 11-1 at 9-11).

So, while references are made to the MLA and NDA, they are included as exhibits to Plaintiff's complaint and Defendants have not challenged validity of these documents. Defendants' arguments asserting new facts or calling into question the sufficiency of the agreement are inappropriate at this stage, and any citations to these agreements do not convert this proceeding into one for summary judgment.

## ARGUMENT

### I. PLAINTIFF'S CONFIDENTIAL CT FORMULA IS REASONABLY PROTECTED TO MAINTAIN ITS TRADE SECRET ACTIONS

Wildwood's scientific formula, the polyurethane coating technology ("CT"), is a unique proprietary technology of great economic value. Through the MLA and NDA, Wildwood imposed rigorous measures to protect the technology and keep it from public disclosure. The CT meets the statutory definition of a trade secret under O.C.G.A. § 10-1-761(4). Defendants' argument hinges on their assertion that "Plaintiff failed to plead factual content that allows the court draw the reasonable inference that Plaintiff took reasonable steps to protect its alleged trade secrets." (Doc. 11-1 at 9).

Defendants attempt to support this wayward theory by incorrectly suggesting the NDA between the parties was the exclusive measure of protection for the CT formula and that the NDA restricted the "use of intangible information in perpetuity," and they offer a mercurial theory akin to a statute of

limitations/abandonment/laches argument to advance their defense. Defendants heavily rely upon summary judgment cases that ultimately found the information in question not to be a trade secret; however, it is premature to apply those cases in the context of Defendants' present motion to dismiss.

Instead, this Court has recognized the difficulty in granting a motion to dismiss on the basis of whether the measures taken to protect a trade secret were sufficient. *Airwatch LLC v. Mobile Iron, Inc.*, 2013 U.S. Dist. LEXIS 125817, at *13 (N.D. Ga. September 4, 2013). In *Airwatch*, the court found that because the plaintiff's complaint alleging users of its software were subject to end-user licensing agreements (EULAs) with confidentiality provisions, the EULA language provided a sufficient basis to deny a motion to dismiss. *Id.*

Where the majority of Defendants' authority is derived from cases decided at the summary judgment stage, this Court in *Airwatch* decided, it could not "say at the motion to dismiss stage that the steps AirWatch took to restrict how customers used its program and who had access to its program were inadequate to maintain this information's secrecy." Likewise, at the motion to dismiss stage here, the sufficiency of measures taken by Plaintiff to protect the CT is not yet in question, and the only issue to be decided is whether the pleadings are enough to plausibly infer Defendants' liability for misappropriation of a trade secret. They are.

-8-

**A. Plaintiff's Nondisclosure and Manufacturing Licensing Agreement Sufficiently Employed Protective Measures to Maintain its Trade Secret**

Defendants' first attempt to discount Plaintiff's complaint suggests "nondisclosure agreements, by themselves, are generally not sufficient to protect trade secret information." Doc. 11-1 at 10. First, pluralizing "nondisclosure agreements" disguises the fact that the separate manufacturing licensing agreement is also in place and contains several protective measures beyond a requirement not to disclose the CT formula. Second, Defendants gravely err by relying on *Equifax Servs. v. Examination Management Servs.*, directly and through its lineage, for the notion that a single NDA is insufficient to warrant trade secret status. Defendants' other relevant legal authority (*i.e.,* those not from the district courts of Illinois or Wisconsin) points back to *Equifax* for this unsupported theory.

In direct contradiction to Defendants' point, the *Equifax* court went out of its way to state that a sole NDA could be sufficient to protect a trade secret.

> We do not hold that requiring employees to sign confidentiality agreements alone is never sufficient to constitute a reasonable step to maintain the secrecy of information alleged to have been misappropriated. On the contrary, the formality involved in *requiring an employee to sign a nondisclosure agreement designed to protect specific information may well be the only reasonable step that can be taken* to document the employer's position and to serve as a caution against indiscretion.

*Equifax Servs. v. Examination Management Servs.*, 216 Ga. App. 35, 40 (Ga. Ct. App. 1994) (emphasis added). On a motion for summary judgment, the *Equifax* court actually weighed the factual evidence before reaching an ultimate adjudication on those facts. *Id.* at 40.

In its analysis of the evidence, the court first emphasized the Georgia Trade Secrets Acts requirements that a trade secret is information that (A) "'derives economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons…*and* (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.'" *Id.* at 39 (emphasis in the original). The Georgia Court of Appeals found Equifax's particular agreement to be a "single step," insufficient to manifest a trade secret, because the global company indiscriminately "required each of its thousands of employees to sign an identical 'confidentiality and assignment' agreement…." *Id.* at 39 (comparing *Avnet, Inc. v. Wyle Labs.*, 263 Ga. 615 (437 S.E.2d 302) (1993) (wherein, unlike in *Equifax*, nondisclosure agreements were required of 'certain employees' to whom customer lists had been disclosed specifically to keep the information secret)).

In the present instance, Wildwood, like in *Avnet*, required Add Bac/ABI to share the CT formula only on a need-to-know basis (Doc. 1., ₱ 32), Defendants were

required to notify Wildwood of any proposed persons it wished to share the information with <u>prior</u> to any disclosure (Doc. 1, ⁋ 33), and, once permission was granted from Wildwood, those individuals were required to sign the MLA and NDA. (Doc. 1, ⁋ 33).

The *Equifax* court further acknowledged that "since an action for misappropriation of trade secrets is not dependent on the existence of a written contract, it would appear that it is the emphasis on the importance of secrecy in the agreement that is most relevant here, and not the characterization of the lists as something other than 'trade secrets.'" *Equifax* at 40. The foreign correspondents lists at issue there contained names, addresses, contact persons, phone and fax numbers of foreign correspondents around the world. *Id.* at 35. The trial court there found "the quality of information at issue to be such that it 'was publicly ascertainable without using misappropriation or other legal means.'" *Id.*

Defendants' reliance on *Equifax* is misplaced for the notion that a single NDA is insufficient protection to establish the CT formula as a trade secret. The very nature of the Equifax's readily ascertainable list of publicly available information is vastly different from the scientific CT formula Wildwood licensed to Defendants, which incorporates methods and formulations unique to the industry.

Sufficient protective measures were put in place through the nondisclosure agreement *and* the Manufacturing License Agreement. (Doc. 1 at 39-46). The MLA restricts the use of the CT formula to be used "solely in connection with the Manufacturing Process." (Doc. 1 at 40). The nondisclosure agreement references this objective to protect the CT formula in its second paragraph, acknowledging, "WHEREAS, Receiving Party has requested information from Company *in connection with consideration of a manufacturing and licensing transactional relationship* between Receiving Party and Company." (Doc. 1 at 47) (emphasis added). Thus, the NDA's purpose is to bolster protection of the CT formula information shared in the course of executing the MLA. On a motion to dismiss, rather than summary judgment, Plaintiff's complaint that the NDA and MLA convey proper measures must be accepted as true and construed most favorably toward Wildwood.

Defendants' claim that a single NDA is insufficient after "several years have passed between the execution of the nondisclosure agreement and the alleged trade secret misappropriation" is similarly incorrect. (Doc. 11-1 at 10-11). *Equifax* refers to the passage of time as a factor only in regard to the unenforceability of its confidentiality agreement (discussed at length *infra*) due to the indefinite time restriction against using general information learned while working at *Equifax*. *Id.*

at 38. So, the *Equifax* court thereby concluded that, "Even with the confidentiality agreement fresh in mind, a self-interested employee may certainly be expected to reach a similar conclusion [that the confidentiality agreement protected only readily ascertainable information] in the absence of further efforts by Equifax to clarify the matter." *Id.* at 40.

### B. Wildwood is Unconcerned with Defendants' General Knowledge and Seeks to Remedy Unauthorized Use of its Misappropriated CT Formula

Defendants next suggest that nondisclosure agreements "which restrict the use of intangible information in perpetuity (like Plaintiff's NDA) are too broad and indefinite to be enforceable." (Doc. 11-1 at 11). The case law they cite in support indicates this is a fact-finding errand, usually decided at summary judgment or trial, to first determine whether the subject information qualifies as a trade secret. Then, the courts tend to go back to weigh whether the agreements were enforceable. Nevertheless, Plaintiff has asserted that the trade secret it seeks a remedy for is its CT formula, which continues to be used by Defendants without Plaintiff's permission. (Doc. 1, ¶¶ 101, 102). Despite this, Defendants attempt to redirect Plaintiff's complaint against "Defendants' use of 'information' and 'know how' into perpetuity" by broad reference to the first paragraph of the attached NDA, rather than pointing to any allegations in Plaintiff's complaint. *Id.* Wildwood is exclusively

concerned with the misappropriation of its CT formula, together with unauthorized formulas derived therefrom, and physical records pertaining thereto.

Defendants attempt to bolster their theory by stating: "Covenants which restrict the dissemination of personal knowledge cannot be drawn with 'you can never do so-and-so' type language." *AmeriGas Propane, L.P. v. T-Bo Propane, Inc.*, 972 F. Supp. 685, 694 (S.D. Ga. 1997) (citing *Equifax*). The *Equifax* opinion, upon which *AmeriGas Propane* relies, involved a confidentiality agreement and a nondisclosure agreement between the company and its employees. 216 Ga. App. 35 at 37. The nondisclosure agreement stated, "'I will not release or disclose any…confidential information during the course of my employment with Equifax or at any time thereafter.'" *Id.* The confidentiality agreement separately defined trade secrets as "strictly limited to 'the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, or improvement that is valuable and secret.'" *Id.*

Due to this delineation by the agreements, the *Equifax* court determined, "Trade secrets as defined in the agreement are not at issue here." *Id.* Because the foreign correspondents list at issue fell into the confidential information category, the *Equifax* court applied the Supreme Court of Georgia's decision in *Thomas v. Best Mfg. Corp.*:

> To restrict an employee from utilizing the experience gained and using information *not designated as trade secrets* and attempting to extend the restriction beyond the employer's business in perpetuity to that of its clients, customers, consultants, licensees or affiliates without geographic restriction reaches beyond the scope permitted in Georgia in terms of time, territory, and activities protected. Although the employer is attempting to protect confidential information relating to his business, the restraint is so broad as to be unreasonable.

*Id.* (citing *Thomas v. Best Mfg. Corp.*, 234 Ga. 787, 788 (1) (218 S.E.2d 68) (1975) (emphasis supplied in the *Equifax* opinion)). In particular, the *Thomas* court elaborated those indefinite agreements regarding information *other than trade secrets* are unenforceable because "a man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment, are not the property of his employer." *Thomas* at 788-89 (emphasis added).

On the contrary, Wildwood is not alleging the misappropriation of anyone's aptitude, skill, or know-how. Instead, Defendants have stolen the CT formula. They gained a limited license to use the formula under the MLA and NDA, and now that they no longer have such license, they have the audacity to argue that they may continue to use the CT formula without royalty, because the MLA and NDA were insufficient to protect the CT formula.

The *Equifax* court also acknowledged a separate Supreme Court of Georgia opinion holding that a former employee has a right to take all the skill, knowledge, and information "received, so long as nothing is taken that is *the property of the employer*. Trade secrets are *the property of the employer* and [like any property of the former employer] cannot be taken or used by the employee for his own benefit…." *Equifax* at 41. citing *Avnet, Inc. v. Wyle Labs*., 263 Ga. 615, 618 (Ga. 1993) (emphasis supplied in *Avnet*). Provisions that do not restrict the use of the "'aptitude, skill, dexterity, . . .mental ability, and such other subjective knowledge as he would have obtained while in the course of the employment'…[are] not invalid or unreasonable." *Id*. at 38. The *Equifax* court made this distinction more concrete, finding it could not "ignore the fact that Equifax has litigated this action as if property rights in [microfiche and computer database] at issue exist if and only if they may be characterized as embodiments of certain Equifax trade secrets." *Id.* at 42.

Reviewing the Georgia Supreme Court's trade secret decision after the 1996 amendment to the GTSA, the *AmeriGas Propane* court found *Avnet* was still good law and "reaffirmed the validity of the tangible/intangible information distinction." *Id.* at 698. As a result, the court found the GTSA's "in whatever form" clause simply refers to any of a variety of tangible forms upon which customer lists can be created.

-16-

*Id.* As such, "companies may create customer lists on notebook paper, parchment, computer disk, microfiche, or on the back of a napkin; such tangible lists are protected by the Trade Secrets Act. The former employee's personal knowledge of the information on these lists, however, can only be curtailed from use through restrictive covenants." *Id.*

Here, Plaintiff seeks to enjoin the continued use of the CT formula and its unauthorized applications. Specifically, Plaintiff has asked this Court under its trade secret claims, to instruct Defendants to stop use of and return all "original copies of materials, media (including but not limited to electronic and archive storage media) and documents that contain, summarize, or reflect Plaintiff's Trade Secrets, including those listed above; provide the Court with the original unaltered electronic media on which any such Trade Secret materials are stored" (Doc. 1, ¶ 99(q)) and "refrain from accessing any Plaintiff Trade Secrets that may be stored in third party servers until further order of this Court." (Doc. 1, ¶99(r), ¶115(w-x)).

## C. There was no undue delay in bringing this action.

Defendant alludes to the two-and-a-half-year period between Mr. Croley's first observation that led to his suspicion of trade secret misappropriation and the filing of this suit to suggest a waiver of protective measures through "tolerance" of a misappropriation. Doc. 11-1 at 5, 11-12. Defendant inaccurately represents two

cases in support and still does not connect those distinguishable holdings to the motion to dismiss standard presently before this Court.

To begin with, the statute of limitations for a Georgia Trade Secrets Act claim is five (5) years. O.C.GA. § 10-1-766. The statute of limitations for a Defend Trade Secret Act claim is three (3) years. 18 U.S.C. § 1836(d). For either trade secret claim, the Plaintiff has every right to bring its claims for misappropriation within the allotted statute of limitations.

As to its factual representations, Defendants claim Plaintiff made "no response other than the April 24, 2019 letter." Despite neglecting to connect its assertion to any authority creating such an obligation, and in addition to Plaintiff's counsel sending the April 24, 2019 demand letter, the complaint and its attachments show factual support of additional attempts to rectify the misappropriation. A letter *from Defendants' counsel* is attached as Exhibit C wherein it references another letter from Plaintiff on May 10, 2019 requesting reports that were obligated under the agreement. (Doc. 1 at 53-54). That same letter also references a mediation attempt in which counsel suggests dates for that mediation. (Doc. 1 at 54). The parties ultimately mediated the dispute, although they reached an impasse on August 20, 2019.

Defendant claims Plaintiff "tolerated explicit violations of the agreements which Plaintiff alleges are the only measures Plaintiff relied up on to protect its alleged secrets." Doc. 11-1 at 9.   Through this, Defendants gloss over their transgressions by offering the self-serving claim Plaintiff did not make reasonable efforts to protect trade secrets because it "tolerated dissemination of its alleged trade secrets, which amounts to an affirmative waiver of any claim of secrecy." Doc. 11-1 at 11-12.

Defendant's authoritative support is incorrect as *Stargate* did not instruct *clients* to work for a competitor, as Defendant's parenthetical suggests. *Stargate Software Int'l, Inv. V. Rumph*, 224 Ga. App. 873 (1997). Again on summary judgment, weighing evidence presented, the Georgia Court of Appeals recognized "Requiring employees to sign confidentiality agreements may, in some circumstances, be 'sufficient to constitute a reasonable step to maintain the secrecy of information alleged to have been misappropriated.'" *Id.* at 877 (citing *Equifax*). Stargate's sole client, Rayonier, gave Stargate an ultimatum to work together with Orion, or not at all, on its project going forward. *Id.* at 874.

Stargate's CEO told its employees to work for Orion on their joint venture with the expectation that the parties would execute a future agreement in writing, but there was no written agreement in place. *Id.* at 875.  The Court of Appeals stated

"[t]ransferring the employees with such a charge necessarily gave Orion access to trade secrets. When telling its former employees to work for Orion, Stargate gave no instructions as to the confidentiality of documentation on the projects." *Id.* at 877. For that reason, the appellant failed to impart reasonable efforts to maintain its trade secrets for their mutual client's project. *Id.*

This case is irrelevant, as Wildwood never asked any of its employees to join Add Bac. Wildwood cannot be said then to have similarly waived its right to protect its trade secrets. The same facts do not exist – nor does this case stand for the proposition that the duration of a trade secret misappropriation waives any security measures to preserve the secrecy of a trade secret.

Plaintiff's further reliance on *TriEst Irrigation LLC v. Hiers*, suffers the same miscalculation. *TriEst*, too, cites *Equifax* and *Diamond Power Int'l* for the principal that general confidentiality agreements signed by all employees *may* not be sufficient to be considered reasonable efforts to maintain secrecy. Defendants claim the "'plaintiff must demonstrate that it has taken reasonable efforts to maintain its secrecy by not widely distributing the information to its employees without proper controls.'" (Doc. 11-1 at 12) (citing *Diamond Power Int'l* at 1333). This entirely ignores Plaintiff's complaint and the attached agreements, by which Wildwood

restricted access to the CT formula on a need-to-know basis and only to those persons were required to sign the NDA.

## II. <u>EACH OF PLAINTIFF'S COUNTS IS SUFFICIENTLY SUPPORTED WITH FACTUAL ALLEGATIONS TO STAND ON ITS OWN</u>

Finally, Defendants aver "Plaintiff's breach of contract claims rise or fall with Plaintiff's statutory trade secrets claim." (Doc. 11-1 at 9). However, without asserting any misappropriation claim, Counts I and II for breach of contract are still sufficiently supported with factual allegations on their own and stand separate and apart from the claims for misappropriation.

As Plaintiff points out, the MLA required Defendants to provide a detailed written report showing the calculation of Royalty payments due to Wildwood. (Doc. 1, ¶44). Plaintiff then asserts, "Add Bac is in breach of the MLA for failing to provide the required reports to Wildwood and failing to pay Royalty payments due and owing to Wildwood." (Doc. 1 at 12, ¶ 45). Plaintiff's Complaint also alleges Defendants Add Bac and ABI failed to submit accurate sales reports for the use of the CT in accordance with the MLA. (Doc.1, ¶66(e)). The complaint further alleges Defendants "failed to pay Plaintiff's Royalties owed under the MLA." (*Id.*, ¶66(f)).

The same core issues apply to Defendants Ed and Judy Staten. As Plaintiff included in its complaint, the Statens used Add Bac and ABI as alter egos. (Doc.1, ¶74). The complaint alleges royalty payments that should have been paid to

Wildwood were deposited in the Statens' personal accounts via Add Bac and ABI. Further support for this position is found in the assertions that the Statens paid payroll to Add Bac and ABI employees from their personal accounts (Doc. 1, ℙ 52) and that some of the Royalties that were paid to Wildwood were paid from the personal bank accounts belonging to the Statens. (Doc. 1, ℙ 53).

Counts I and II are fully supported within the factual allegations of the complaint. Wildwood references the MLA provisions that required Defendants to pay royalties for CT-embedded products within 31 days of the first month following shipment of the product by Add Bac. (Doc. 1, ℙ41). Plaintiff, in its complaint, asserts "Defendants have failed to pay Royalties when due and currently owe Wildwood in excess of Four Hundred Thousand Dollars…in unpaid Royalties." (Doc 1, ℙℙ42).

Plaintiff also references the MLA to demonstrate the obligation accepted by the Defendants to not alter the CT formula without express permission from Wildwood. (Doc. 1, ℙ 26). Plaintiff further alleges that Defendants breached this agreement and continue to do so. (Doc. 1, ℙℙ 37-40).

These are not dependent claims. Nothing therein suggests misappropriation of a trade secret. Defendants failed to pay all royalties owed for their use of the CT formula. A trade secret need not be misappropriated for a party to fail to make required payments under a licensing agreement. Conversely, a trade secret could be

misappropriated while royalties are still paid out to the trade secret owner. Had Plaintiff not asserted any misappropriation claim, Counts I and II for breach of contract are sufficiently supported with factual allegations to withstand a Motion to Dismiss on their own.

### III.   CONCLUSION

By statute, "Trade secret means information, without regard to form, including technical data, a formula…a method, a technique…a process…or a list of actual or potential customers or suppliers which is not commonly known by or available to the public." O.C.G.A. § 10-1-761(4). That information must derive economic value from not being generally known or readily ascertainable. §10-1-761(4)(A). And that information must be the subject of reasonable efforts to maintain its secrecy. §10-1-761(4)(B). There is nothing general about the detailed protections Plaintiff put in place to maintain its CT formula's secrecy.

Plaintiff has pleaded that two separate agreements created obligations upon Defendants wherein they agreed to only share information regarding the CT formula and its manufacturing process on a need-to-know basis (Doc. 1, ¶ 32) and identify each person with which Defendants wished to share the information, who then were also required to sign the agreements only <u>after</u> permission was giving by Wildwood (Doc. 1, ¶ 33) to receive that knowledge. Defendants have misconstrued the facts to

portray a restriction on all of Defendants' employees' general knowledge; however, that is not the purpose, scope, or design of the MLA and NDA. The scope of the MLA restricts these companies (not employees) use of the scientific formula. That formula is unknown to the rest of the industry and not easily discoverable by the public. The NDA in place points directly to those matters covered under the MLA – i.e., the manufacture and application of the CT formula.

Plaintiff Wildwood only seeks to rightfully enjoin the use of its trade secret, to be compensated for past authorized use, obtain damages for Defendants' unauthorized use, and procure rightful penalties for being forced to take this legal action. Wildwood has properly pleaded all the necessary elements and facts in support and Defendants' motion to dismiss should therefore be denied.

Respectfully submitted this 30th day of August, 2021.

/s/ *David L. Walker, Jr.*
David L. Walker, Jr.
Ga. Bar No.: 731663
dwalker@fcwlawfirm.com
Anthony Cammarata, Jr.
Ga. Bar No.: 375153
acammarata@fcwlawfirm.com
Xavier T. Romero
Ga. Bar No.: 303588
xromero@fcwlawfirm.com
Attorneys for Plaintiff

FLINT, CONNOLLY & WALKER, LLP

131 East Main Street
Canton, GA 30114
(770) 720-4411

## **LOCAL RULE 7.1 CERTIFICATION OF COMPLIANCE**

I hereby certify that the foregoing has been prepared with Times New Roman,

14-point font in accordance with LR5.1C, NDGa.

Submitted this 30th day of August, 2021.

/s/ *David L. Walker, Jr.*
David L. Walker, Jr.
Ga. Bar No.: 731663
dwalker@fcwlawfirm.com

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this date, I electronically filed the foregoing *Response*

*Brief in Opposition to Defendants' Motion to Dismiss* with the Clerk of Court using

the CM/ECF system, which will automatically send email notification of such filing

to all counsel of record.

Submitted this 30th day of August, 2021.

/s/ *David L. Walker, Jr.*
David L. Walker, Jr.
Ga. Bar No.: 731663
dwalker@fcwlawfirm.com